IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 32407-9-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| OMAR CARLOS, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Omar Carlos appeals his convictions for first degree burglary and second degree assault of a child. He contends that (1) the trial court erred in denying his motion for a continuance after the court granted the State's motion to amend the information the morning of trial, (2) insufficient evidence supported his conviction for first degree burglary, (3) insufficient evidence supported his conviction for second degree assault of a child, and (4) he received ineffective assistance of counsel. We reject his contentions and affirm.

## FACTS

Omar Carlos and Debra Gonzalez were married for six years and divorced in July 2013. Mr. Carlos and Ms. Gonzalez had two children, L.C., born May 28, 2001, and J.C.,

born September 29, 2006. Under the custody arrangement, Mr. Carlos had visitation with L.C. and J.C. every other weekend, including overnight stays on Friday, Saturday, and Sunday nights. Mr. Carlos also had a few hours of visitation every Wednesday after school. Ms. Gonzalez lived in the family home on Perch Avenue in Moses Lake, Washington, with L.C. and J.C. Mr. Carlos lived elsewhere and did not have a key or any of the key codes to his former residence. Ms. Gonzalez had changed the locks to the home as well as the key codes since the divorce. According to Ms. Gonzalez, as of November 19, 2013, she and her ex-husband were getting along "[f]ine." Report of Proceedings (RP) at 49.

On Wednesday, November 20, 2013, Ms. Gonzalez was in Seattle for work. She was scheduled to stay in Seattle through Thursday night, returning home on Friday. Ms. Gonzalez's mother was traveling from Quincy, Washington, to stay overnight with L.C. and J.C. at their home on Wednesday and Thursday. After the boys got home from school, Mr. Carlos took them out for pizza at a local restaurant. It was Mr. Carlos's normal visitation night with the boys. Mr. Carlos had one beer with dinner and when finished, drove the boys home. During the drive, the boys overheard several heated telephone conversations between Mr. Carlos and Ms. Gonzalez that included vulgar name calling. After arriving at the house, Mr. Carlos called Ms. Gonzalez again, complaining

2

that nobody was at the house to watch the boys. L.C. told his father several times that he and J.C. were fine to be alone at the house until their grandmother arrived. Mr. Carlos got out of the truck and closed the door and made another telephone call.

L.C. testified that when his father got back in the truck, his father told him to "get the fuck out of my truck." RP at 80. As L.C. and J.C. got out of the truck, L.C. replied, "Fuck you, dad," and the two boys began walking toward the front door of the house. RP at 80. L.C. heard the driver's side door open and close. When asked, "Did you do anything in response to hearing that?" L.C. responded, "I turned around and I kind of—I braced for something, because I knew something was going to happen." RP at 81. Defense counsel did not object or move to strike L.C.'s response.

L.C. testified that his dad grabbed him by the collar of his sweatshirt, threw him against the garage, and head-butted him, all while yelling, "[D]on't you disrespect me, [L.C.]" RP at 86. L.C. stated he felt no pain when his body hit the wall. Mr. Carlos held him against the wall for about three minutes. After about one and one-half minutes of that time, Mr. Carlos moved his hands from L.C.'s collar to his throat. L.C. stated that when his father's hands were on his throat, it did not hurt. He stated his breathing was "[o]kay." RP at 87. But when asked whether he was able to breathe normally while his father's hand was on his neck, L.C. responded, "No." RP at 87.

3

L.C. testified that after putting at least one hand on L.C.'s throat, his dad grabbed both of his ears. Mr. Carlos then grabbed L.C. by the collar of his sweatshirt again and threw him onto a gravel patch next to the garage. L.C. stated he landed on his back but that it did not hurt. Mr. Carlos stood over L.C. holding L.C.'s collar and told him, "[Y]ou're just like your mother, your mother's a whore, fuck you, and don't ever disrespect me like that." RP at 90. Mr. Carlos then picked L.C. up by the collar and threw him into the garage once more before returning to his vehicle and driving off. L.C. and J.C. went inside the house and locked the front door behind them. L.C. grabbed some ice for his wounds and broke down crying with J.C. L.C. told J.C. to hide if their father returned.

Ms. Gonzalez testified that approximately 30 minutes after her last telephone call from Mr. Carlos, she received another telephone call from him stating that he had just "kicked our son's ass." RP at 55. He then hung up the phone. Ms. Gonzalez called her neighbor, Rita Morfin, to ask her to go over to the house to see what was happening.

Ms. Morfin testified that when she arrived at Ms. Gonzalez's house, she noticed L.C. was "a little distraught" and crying. RP at 129. Ms. Morfin stated that Mr. Carlos returned to the house while she was there. Mr. Carlos entered the house through the front door, which was ajar when he arrived. Ms. Morfin noticed that L.C. seemed nervous

4

when his father arrived. Ms. Morfin asked Mr. Carlos if everything was okay, but he did not respond. Ms. Morfin returned to her home and called Ms. Gonzalez, telling her to call 911. After calling Ms. Gonzalez, Ms. Morfin watched Ms. Gonzalez's house and saw Mr. Carlos leave. She stated that to her knowledge, Mr. Carlos did not return to the house again that evening.

L.C.'s testimony contradicted Ms. Morfin's on this point. He testified that his father returned several times. When Mr. Carlos first returned, the front door was locked and the garage door closed. L.C. heard Mr. Carlos attempting to open the front door. Then, he heard the garage door opening. L.C. ran to the inside garage door and attempted to hold it closed to keep his father out. L.C. was unable to do so, and his father entered. L.C. repeatedly yelled at Mr. Carlos to leave the house. Mr. Carlos grabbed him by the collar of his sweatshirt and threw him on the floor. Eventually, Mr. Carlos left the residence and did not return.

Ms. Gonzalez took Ms. Morfin's suggestion and immediately called the police. Curt Ledeboer, officer for the Moses Lake Police Department, responded with other officers. Officer Ledeboer met L.C., J.C., and their paternal grandmother at the boys' home. After speaking with them briefly there, Officer Ledeboer followed them to the paternal grandmother's house to take a statement from L.C. Officer Ledeboer talked with

5

L.C. again and noticed he had a lump on his forehead. Officer Ledeboer took pictures of L.C.'s injury and also talked to Ms. Gonzalez.

Ms. Gonzalez returned to Moses Lake early the next morning, Thursday, November 21, 2013. Officer Ledeboer returned to the Perch Avenue home Thursday afternoon to meet Ms. Gonzalez and take additional statements from her and L.C. Officer Ledeboer documented L.C.'s injuries. L.C. had bruising on his forehead, a lump on his left jaw, a bruise to the right side of his face, bruising on the left and right sides of his neck, a bruise on his pectoral, and a scrape mark on the back of his elbow. He also had bruising and cuts on the back of both ears. Officer Ledeboer indicated the bruising on L.C.'s neck appeared "dark and noticeable" and was finger-sized and shaped. RP at 144.

While at the Perch Avenue home, Officer Ledeboer learned that Mr. Carlos had arrived voluntarily at the Moses Lake Police Department and that he wanted to make a statement. Officer Ledeboer returned to the police station and took an audiotaped statement from Mr. Carlos. When asked by the State at what point he returned to the Perch Avenue home to talk with Ms. Gonzalez and L.C., Officer Ledeboer responded, "[a]fter the completion of the conversation with Mr. Carlos." RP at 142. Then, unprompted, he added, "I had to take [Mr. Carlos] to jail and then I went back." RP at 142. Defense counsel did not object or move to strike the second, unprompted statement.

6

After Mr. Carlos's arrest, the State filed the original information. This information, dated November 22, 2013, charged Mr. Carlos with residential burglary (count 1), assault of a child in the second degree (count 2), and violation of a court order (count 3). Count 2 alleged three alternative means of committing the crime of second degree assault of a child, including: (1) by recklessly inflicting substantial bodily harm, (2) by assaulting the child with a deadly weapon, and (3) by strangulation.

The State filed an amended information on March 10, 2014, nine days before trial. The amended information changed the allegation in count 1 from residential burglary to first degree burglary, changed the allegation in count 2 by removing strangulation as an alternative means, and removed count 3.

On the morning of trial, the State moved to file a second amended information which changed count 2 to re-allege strangulation as an alternative means, but dropped the deadly weapon alternative means. Mr. Carlos objected and argued that the addition of the alternative means of strangulation prejudiced him at that point in the proceedings. The court granted the State's motion for a second amended information. Mr. Carlos then moved to continue the trial for one week in light of the amendment on the day of trial. The court denied the motion, reasoning that the parties understood that the State had

7

always intended to proceed under the alternative strangulation means, and that the change in count 2 nine days prior was obviously a scrivener's error.

At the start of trial, defense counsel waived his opening statement but reserved the right to make his opening statement at the close of the State's case. Defense counsel then declined to give an opening at the close of the State's case. The defense rested without calling any witnesses.

At the completion of the evidence phase of trial, the court heard arguments on jury instructions. The State offered a *Petrich*[1] unanimity instruction and argued that the court should advise the jury that to return a verdict of guilty for the assault charge, it must unanimously decide that Mr. Carlos committed at least one of the two alternative means of committing second degree assault of a child. Defense counsel agreed that the jury should be advised that it must unanimously decide that Mr. Carlos committed at least one of the two alternative means but suggested that a *Petrich* instruction would not be necessary as long as the State gives a proper closing argument. The court disagreed and concluded that where each alternative means is supported by substantial evidence, a *Petrich* instruction and special verdict form are unnecessary. The State argued in its closing argument:

---

[1] *State v. Petrich*, 101 Wn.2d 566, 572, 683 P.2d 173 (1984), *overruled on other*

8

If six of you find beyond a reasonable doubt that Omar Carlos intentionally assaulted [L.C.], and thereby recklessly inflicted substantial bodily harm, and the other six decide that beyond a reasonable doubt Omar Carlos assaulted [L.C.] by strangulation, and you all agree that assault two was committed, then you don't have to actually agree whether or not that occurred by strangulation or by substantial bodily harm.

RP at 209. Defense counsel did not object.

The jury found Mr. Carlos guilty of both first degree burglary and second degree assault of a child. The jury also returned special verdicts for both charges, finding that Mr. Carlos was a member of the same family or household as Ms. Gonzalez for count 1 and as L.C. for count 2. On March 25, 2014, the court sentenced Mr. Carlos to 31 months for the first degree burglary and 46 months for the second degree assault of a child to be served concurrently.

Mr. Carlos appeals.

## ANALYSIS

1.    *Whether the trial court erred in denying Mr. Carlos's motion for a trial continuance*

Mr. Carlos contends that the trial court erred in denying his motion for a trial continuance that he made after the court allowed the State, on the first day of trial, to add strangulation as an alternative means to count 2.

---

*grounds by State v. Kitchen*, 110 Wn.2d 403, 756 P.2d 105 (1988).

9

"A grant or denial of a motion for a continuance is a decision that rests within the sound discretion of the trial court." *State v. Kelly*, 32 Wn. App. 112, 114, 645 P.2d 1146 (1982). The trial court may consider a number of factors including "surprise, diligence, redundancy, due process, materiality, and maintenance of orderly procedure." *State v. Downing*, 151 Wn.2d 265, 273, 87 P.3d 1169 (2004).

This court reviews a trial court's denial of a motion to continue for an abuse of discretion. *Id.* at 272. A trial court abuses its discretion when its decision was manifestly unreasonable or exercised on untenable grounds or for untenable reasons. *Id.* (quoting *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)). "The decision to deny the defendant a continuance will be disturbed on appeal only upon a showing that the defendant was prejudiced or that the result of the trial would likely have been different had the motion been granted." *Kelly*, 32 Wn. App. at 114. This court considers the totality of the circumstances related to a continuance request, especially the reasons presented to the trial court at the time of the request. *Id.* at 114-15.

An amendment to the information on the morning of trial may be cause for a continuance. *State v. Purdom*, 106 Wn.2d 745, 748-49, 725 P.2d 622 (1986). However, this case is distinguishable from *Purdom*. In *Purdom*, the amendment raised an entirely new criminal charge under a separate section of the criminal code. *Id.* at 746-47. Here,

the charge remained the same—attempted second degree assault, with only a different statutory means alleged for committing the crime. *See State v. Gosser*, 33 Wn. App. 428, 435, 656 P.2d 514 (1982). The State originally charged Mr. Carlos with second degree assault of a child by three alternative means: (1) recklessly inflicting substantial bodily harm, (2) assaulting the child with a deadly weapon, and (3) strangulation. The State amended the charge nine days before trial by removing the alternative means of strangulation. The second amendment on the day of trial simply returned the means of strangulation and removed the deadly weapon alternative.

In deciding the motion for continuance, the trial court below considered defense counsel's argument that the second amendment of the information on the morning of trial constituted an undue surprise and left him unprepared to defend against the strangulation charge that had been deleted from the information and then added back. The court also considered the State's argument that the alternative means of strangulation had only been removed from the information nine days earlier and defense counsel stated he was ready for trial at the time of that first amendment. The State also argued that at the time of the first amendment, it made it "fairly clear" to Mr. Carlos that it was only intending to amend count 1 and drop count 3, not make any changes to count 2, which contained the

11

second degree assault charge. RP at 10. The court denied the Mr. Carlos's motion to

continue, reasoning:

> Because of the unique circumstances of this particular case . . . the motion for continuance should be denied. This is a case where it is relatively clear that there was a scrivener's error in the process of amending an information. The defendant had long opportunity to prepare for the allegation of strangulation. It was alleged in the police reports upon which . . . the filing was originally based, and prepared for that up until March 10 when the information was amended with that error included.
>
> So I do not find any prejudice to Mr. Carlos, other than the discomfort that's . . . involved in shifting strategies back to a previous strategy that there was plenty of time to develop and was well developed.

RP at 19. Based on this record, Mr. Carlos has not shown how the trial court abused its

discretion in denying the motion for continuance.

    2.    *Whether sufficient evidence supported Mr. Carlos's conviction for first degree burglary*

Mr. Carlos contends that there was insufficient evidence to support his conviction

for first degree burglary because he had a limited privilege to enter and remain in the

house.

"The State . . . must produce substantial evidence to support the elements of a

crime." *State v. Butler*, 165 Wn. App. 820, 829, 269 P.3d 315 (2012). This court reviews

de novo whether the State has met its burden of production. *Id.* Evidence is sufficient if,

when viewed in the light most favorable to the State, it permits a rational trier of fact to

12

find the essential elements of the crime beyond a reasonable doubt. *State v. Tilton*, 149 Wn.2d 775, 786, 72 P.3d 735 (2003) (quoting *State v. Joy*, 121 Wn.2d 333, 338, 851 P.2d 654 (1993)). Courts must draw all reasonable inferences from the evidence in favor of the State and interpret the evidence most strongly against the defendant. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial evidence receives the same weight as direct evidence. *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004). Appellate courts defer to the fact finder on the resolution of conflicting testimony, credibility determinations, and the persuasiveness of the evidence. *Id.* at 874-75.

For the first degree burglary charge, the State had to prove beyond a reasonable doubt that Mr. Carlos entered or remained unlawfully in the Perch Avenue home with the intent to commit a crime against a person or property therein, and that in entering or while in the building or in immediate flight therefrom, he assaulted another person. RCW 9A.52.020. Mr. Carlos only contests the sufficiency of the evidence showing that he entered or remained unlawfully in the Perch Avenue home. A person "'enters or remains unlawfully' in or upon premises when he or she is not then licensed, invited, or otherwise privileged to so enter or remain." RCW 9A.52.010(5).

Here, Ms. Gonzalez's testimony made clear that Mr. Carlos was not permitted to enter the Perch Avenue home, where she lived with L.C. and J.C., without permission.

13

Mr. Carlos lived elsewhere and did not have a key or any of the key codes to his former residence. Ms. Gonzalez had changed the locks to the home as well as the key codes since the divorce. When asked if Mr. Carlos had permission to enter the home on November 20, 2013, Ms. Gonzalez replied, "No." RP at 52. When asked if Mr. Carlos had a standing invitation to enter the residence whenever he wanted, Ms. Gonzalez responded, "No. Unless he was invited or asked to go in." RP at 52.

Furthermore, L.C. testified that he had locked the doors to the home after he and J.C. were inside following the initial altercation with his father. He stated that on returning to the house, his father tried to open the front door, but when he found it locked, he opened the garage door and entered the house through the inside garage door, pushing past L.C. who was attempting to block his entry. L.C. testified he repeatedly yelled at his dad to "[g]et out" once his dad was inside the house. RP at 105. Thus, based on L.C.'s testimony, it is apparent that he did not permit his father to enter the residence the evening of November 20, 2013.

Mr. Carlos relies on *State v. Cordero*, 170 Wn. App. 351, 284 P.3d 773 (2012) for the proposition that he had a limited privilege to enter the home on the date of the offense based on his parental obligation to care for his minor children. However, in *Cordero*, the court actually concluded the evidence was sufficient to show that the defendant

14

unlawfully entered a motel room in which a mother and her 14-year-old daughter lived, so as to support a conviction for first degree burglary. *Id.* at 355-56, 364-65. The defendant contended the daughter invited him inside, but the court found that the daughter and the defendant, who had dated the daughter, were aware of the mother's express disapproval of the defendant's presence in the room. *Id.* at 364-65. Thus, any invitation of the daughter was ineffective. *Id.* at 365. While *Cordero* discusses familial responsibilities, it does not stand for the proposition for which Mr. Carlos cites it—that a parent has a statutory obligation to provide for his or her child that causes the child's authority to exclude entry into his or her home to yield to the nonresident parent's statutory obligation. *See id.* at 363. Therefore, *Cordero* is not helpful to Mr. Carlos's argument.

Finally, Mr. Carlos contends that the jury should have been instructed that RCW 9A.52.090(3) provides a defense to an actor who "reasonably believed that the owner of the premises, or other person empowered to license access thereto, would have licensed him or her to enter or remain." But Mr. Carlos overlooks that this defense is limited to first and second degree criminal trespass. RCW 9A.52.090. Therefore, Mr. Carlos's questionable belief that Ms. Gonzalez would have permitted him to enter on the evening of November 20, 2013, is irrelevant, and it would have been error for the jury to be instructed on such a defense. We therefore conclude that the State's evidence was

15

sufficient to prove that Mr. Carlos entered or remained unlawfully in the Perch Avenue

home on November 20, 2013.

> 3. *Whether substantial evidence supported both alternative means for committing second degree assault of a child*

Mr. Carlos also contends that the State failed to produce substantial evidence to

support both alternative means for committing second degree assault of a child.

"A fundamental protection accorded to a criminal defendant is that a jury of his

peers must unanimously agree on guilt." *State v. Smith*, 159 Wn.2d 778, 783, 154 P.3d

873 (2007). In order to safeguard the defendant's constitutional right to a unanimous jury

verdict as to the alleged crime, substantial evidence of each of the relied-on alternatives

must be presented. *Id.* As long as there is substantial evidence to support each means

charged, a unanimity instruction is not needed. *State v. Arndt*, 87 Wn.2d 374, 377, 553

P.2d 1328 (1976).

There are seven alternative means of committing second degree assault.

RCW 9A.36.021(1)(a)-(g). Here, the State charged Mr. Carlos with two alternative

means of second degree assault: (1) recklessly inflicting substantial bodily harm and

(2) strangulation. RCW 9A.36.021(1)(a), (g). The jury was instructed that to convict Mr.

Carlos of second degree assault of a child, the State had to prove beyond a reasonable

doubt that he "intentionally assaulted [L.C.] and thereby recklessly inflicted substantial

bodily harm; or . . . assaulted [L.C.] by strangulation." Clerk's Papers (CP) at 84. Mr. Carlos contends that the State failed to produce substantial evidence for both alternative means.

a.    *Substantial bodily harm*

"Substantial bodily harm" means bodily injury that involves (1) a temporary but substantial disfigurement, or (2) which causes a temporary substantial loss or impairment of the function of any bodily part or organ, or (3) which causes a fracture of any bodily part. RCW 9A.04.110(4)(b). Mr. Carlos contends that the State failed to prove beyond a reasonable doubt any of these three possibilities of substantial bodily harm. The State argues that L.C.'s injuries, as documented in the record, support a finding of "substantial bodily harm" involving "temporary but substantial disfigurement."

In *State v. McKague*, 172 Wn.2d 802, 262 P.3d 1225 (2011), the court clarified what type of bodily injury must be present to constitute "temporary but substantial disfigurement" for purposes of RCW 9A.04.110(4)(b). In that case, Jay McKague had punched the victim several times in the face and pushed him to the ground, causing his head to strike the pavement. *Id.* at 806. As a result, the victim later showed facial bruising and swelling which lasted several days, and lacerations to his face, back of head, and arm. *Id.* The court commented that "'substantial' . . . signifies . . . a showing greater

17

than an injury merely having some existence." *Id.* at 806. The court approved a definition of "substantial" as "'considerable in amount, value, or worth.'" *Id.* (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2280 (2002)). In holding that the facts supported the jury's finding that Mr. McKague had caused his victim sufficient injuries to meet the clarified standard, the court also cited with approval *State v. Hovig*, 149 Wn. App. 1, 5, 13, 202 P.3d 318 (2009) (red and violet teeth marks lasting up to two weeks constituted substantial bodily injury); and *State v. Ashcraft*, 71 Wn. App. 444, 448-49, 455, 859 P.2d 60 (1993) (several bruises on a three year old, some more than three days old, from being disciplined with a shoe, were temporary but substantial disfigurement). The court explicitly rejected that portion of the lower court's definition that would make any demonstrable impairment a substantial injury, no matter how minor. *McKague*, 172 Wn.2d at 806.

Officer Ledeboer testified that when he talked with L.C. at his grandmother's house the night of the incident, he observed that L.C. had a noticeable, fresh-looking lump on his forehead that was "bigger than a quarter in circumference." RP at 138. Officer Ledeboer took pictures of the injury that night. The next day, Officer Ledeboer observed more injuries, which he also documented. Officer Ledeboer testified that L.C.'s injuries included bruising on his forehead, a lump on his left jaw, a bruise to the right side

18

of his face, bruising on the left and right sides of his neck, a bruise on his pectoral, and a scrape mark on the back of his elbow. L.C. also had bruising and cuts on the back of both ears. Officer Ledeboer indicated the bruising on L.C.'s neck appeared "dark and noticeable" and ran at an angle up L.C.'s neck consistent with fingers. RP at 144.

Viewing these facts in the light most favorable to the State, a rational trier of fact could conclude that L.C.'s injuries were "substantial" because they were "considerable in amount, value, or worth." Indeed, the multiple bruises and lacerations present in this case are very similar to the injuries discussed in *McKague*. Thus, the State produced sufficient evidence to prove the "temporary but substantial disfigurement" means of "substantial bodily harm."

### b. Strangulation

"Strangulation" means "to compress a person's neck, thereby obstructing the person's blood flow or ability to breathe, or doing so with the intent to obstruct the person's blood flow or ability to breathe." RCW 9A.04.110(26). Mr. Carlos contends the State failed to prove strangulation beyond a reasonable doubt. The State argues that L.C.'s testimony supports a finding that Mr. Carlos compressed L.C.'s neck, thereby obstructing his ability to breathe.

19

L.C. testified that after his father threw him against the garage, his father moved his hands from L.C.'s collar to his throat and held his hands there for about a minute and one-half. When asked if it hurt when his father's hands were on his neck, L.C. replied, "No." RP at 87. When asked how his breathing was, he replied, "Okay." RP at 87. But when asked a question later whether he was able to breathe normally while his father's hands were on his neck, L.C. responded, "No." RP at 87.

The State contends that this testimony established that L.C.'s breathing was at least partially obstructed when his father's hands were on his neck. Mr. Carlos argues that "obstruct" requires complete, not partial obstruction of breathing. Division One of this court recently analyzed the meaning of "obstruct" and concluded "that the plain meaning of obstruct in the strangulation statute is to hinder or block to some degree. That is, the statute applies equally to complete and partial obstructions of either a victim's ability to breathe or to experience blood flow." *State v. Rodriguez*, 187 Wn. App. 922, 935, 352 P.3d 200 (2015).

Mr. Carlos also contends that L.C.'s response that his breathing was "okay" undermines the State's evidence on this element. But this court must consider L.C.'s response in the context of his entire testimony and must view the evidence in the light most favorable to the State. L.C. clarified just one question later that he was unable to

20

breathe normally. We conclude that L.C.'s statement about not being able to breathe normally while his father's hands were around his neck, as well as the subsequent bruising observed by Officer Ledeboer to be "dark and noticeable" and running at an angle up L.C.'s neck consistent with fingers, constitutes substantial evidence that Mr. Carlos assaulted L.C. by means of strangulation.

In conclusion, the record shows that the State produced substantial evidence of both alternative means it charged for second degree assault of a child. We, therefore, conclude that Mr. Carlos's right to a unanimous jury verdict was not compromised when the trial court chose not to give a *Petrich* unanimity instruction.

4.      *Whether Mr. Carlos received ineffective assistance of counsel*

Mr. Carlos contends that his counsel at trial was ineffective for (1) failing to make an opening statement, (2) failing to object to objectionable and prejudicial testimony, (3) failing to recognize and develop viable defenses, and (4) failing to present and argue the bases for an exceptional and mitigated sentence below the standard range at the sentencing hearing.

A claim for ineffective assistance of counsel presents a mixed question of law and fact, which this court reviews de novo. *State v. Jones*, 183 Wn.2d 327, 338, 352 P.3d 776 (2015). "Competency of counsel is determined based upon the entire record below."

*State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). To prevail on a claim of ineffective assistance of counsel, Mr. Carlos must show: (1) defense counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness based on a consideration of all the circumstances; and (2) defense counsel's deficient representation prejudiced him, i.e., there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 334-35. If a defendant fails to establish either prong, this court need not inquire further. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

A defendant must also overcome a strong presumption that counsel's representation was effective. *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004). However, this presumption may be rebutted "where there is no conceivable legitimate tactic explaining counsel's performance." *Id.*

a.  *Failure to make an opening statement*

Mr. Carlos claims his trial counsel was ineffective for not making an opening statement. Initially, defense counsel reserved the right to make an opening statement at the conclusion of the State's case but ultimately decided not to present one.

"A defense counsel's decision to waive an opening statement does not constitute deficient performance under the *Strickland*[2] test." *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 715, 101 P.3d 1 (2004). "Trial counsel has the option of making an opening statement" or potentially waiving it as a "strategic trial tactic." *Id.*

As in *Davis*, Mr. Carlos has cited no authority that an opening statement is required. Mr. Carlos also fails to cite any evidence in the record that waiving the statement was not a tactical decision by counsel. Instead, Mr. Carlos contends that the State failed to identify any tactical or strategic reason why trial counsel would have waived the statement. However, it is not the State's burden to identify such a trial tactic. Even so, the State suggested that one reason for waiving the statement was that the defense's case rested on counsel's cross-examinations of State witnesses and also the insufficiency of the evidence of the State's case-in-chief. Without independent evidence and witnesses of its own, counsel may have decided an opening statement was unnecessary. In addition, it is a sound defense strategy for the defense not to give an opening statement which could telegraph to the State arguments it wishes to reserve until closing, after all of the evidence has been submitted.

---

[2] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

But even if it was not a tactical decision, Mr. Carlos has failed to sufficiently demonstrate how he was prejudiced by his counsel's decision not to deliver an opening statement. *Id.* Under these facts, the decision by defense counsel not to make an opening statement did not constitute ineffective assistance of counsel.

b.      *Failure to object to objectionable and prejudicial testimony*

Next, Mr. Carlos contends his counsel was ineffective for failing to object to witness testimony that was speculative and prejudicial.

Counsel's decisions regarding whether and when to object "fall firmly within the category of strategic or tactical decisions." *State v. Johnston*, 143 Wn. App. 1, 19, 177 P.3d 1127 (2007). The failure to object constitutes ineffective assistance of counsel justifying reversal only in egregious circumstances where the testimony is central to the State's case. *Id.* (quoting *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989)). "To prove that failure to object rendered counsel ineffective, [the defendant] must show that not objecting fell below prevailing professional norms, that the proposed objection would likely have been sustained, and that the result of the trial would have been different if the evidence had not been admitted." *Davis*, 152 Wn.2d at 714 (footnotes omitted). Again, this court presumes that the failure to object was a trial strategy or tactic, and the defendant has the burden to rebut this presumption. *Johnston*, 143 Wn. App. at 20.

The first statement Mr. Carlos argues was objectionable occurred when the State asked L.C. if he did anything in response to hearing his father's truck door open and close behind him. L.C. replied, "I turned around and I kind of—I braced for something, because I knew something was going to happen." RP at 81. Mr. Carlos contends his counsel should have objected to the statement because it was speculative, implying L.C. believed his father was coming to assault him and, because it was prejudicial, suggesting past bad conduct by Mr. Carlos toward his son.

Mr. Carlos's argument that L.C.'s statement suggested prior assaults infers too much. But even if defense counsel should have objected and even if the answer was objectionable, Mr. Carlos does not establish that the failure to object changed the result of the trial. The evidence of assaultive conduct was overwhelming and actually unrefuted.

The second statement that Mr. Carlos argues was objectionable was made by Officer Ledeboer. When asked at what point he returned to the Perch Avenue home to talk with Ms. Gonzalez and L.C. on November 21, 2013, Officer Ledeboer responded, "[a]fter the completion of the conversation with Mr. Carlos." RP at 142. Then, unprompted, he added, "I had to take [Mr. Carlos] to jail and then I went back." RP at 142. Mr. Carlos contends that his counsel should have objected to the unprompted

25

statement because it was a witness response that was outside of the scope of the question asked. *See Johnston*, 143 Wn. App. at 20-21.

Because this court presumes that the failure to object was a legitimate tactical decision, Mr. Carlos must demonstrate an absence of legitimate strategy or tactics in failing to object. However, Mr. Carlos makes no argument as to why the failure to object was not a tactical decision. One tactical reason was not to call extra attention to the fact that the defendant was taken to jail. *Davis*, 152 Wn.2d at 714. But even if Mr. Carlos had proved that not objecting fell below prevailing professional norms and that the proposed objection would have likely been sustained, he has not met his burden of proving the result of the trial would have been different if an objection was made and the trial court instructed the jury to disregard the last statement.

c.      *Failure to recognize and develop viable defenses*

Third, Mr. Carlos contends his trial counsel's performance was deficient for failing to identify and advocate a viable defense theory. He provides no case law to support his argument on this point. Specifically, he contends defense counsel should have argued that he had a privilege to enter the Perch Avenue home to care for his minor children on the night of the altercation.

26

However, as discussed above, sufficient evidence was presented at trial to show that he did not have the express permission of either his ex-wife or his two children. Furthermore, Mr. Carlos provided no relevant case law to show that the obligation to care for minor children created a privilege for him to enter the residence. Therefore, it was tactically reasonable for counsel to decide not to argue this as a defense theory.

Mr. Carlos also contends defense counsel should have offered a jury instruction consistent with RCW 9A.52.090(3). However, as analyzed above, the plain language of RCW 9A.52.090 limits its application to first and second degree criminal trespass. Thus, counsel had reason not to raise such a defense.

Third, Mr. Carlos argues counsel should have offered an instruction on the defense of child discipline, rather than arguing against it when the prosecutor offered it. However, as Mr. Carlos notes, the court gave the instruction over defense counsel's objections, so Mr. Carlos cannot meet his burden of proving prejudice. This court should conclude that Mr. Carlos's ineffective assistance claim for failing to raise certain defenses also fails.

d. *Failure to present and argue the bases for an exceptional and mitigated sentence below the standard range at the sentencing hearing*

Finally, Mr. Carlos contends his counsel was ineffective for failing to argue for an exceptional or mitigated sentence below the standard range at the sentencing hearing. He

27

argues that his counsel should have argued failed defense theories from trial as mitigating factors for sentencing. Mr. Carlos cites *State v. Jeannotte*, 133 Wn.2d 847, 947 P.2d 1192 (1997) for this proposition.

*Jeannotte* provides that under the Sentencing Reform Act of 1981, chapter 9.94A RCW, certain "failed defenses" "may constitute mitigating factors supporting an exceptional sentence below the standard range." *Id.* at 851. The legislature has provided examples of these "failed defense" mitigating circumstances at RCW 9.94A.535(1). But none of the listed defenses apply to this case. While the language of RCW 9.94A.535(1) makes clear that it is not an exclusive list, Mr. Carlos has not provided any legal support for his proposition that the failed defenses in this case are also mitigating circumstances justifying an exceptional sentence.

At sentencing, defense counsel reminded the court that his client was remorseful and generally cooperated with police, and counsel insisted the punishment did not fit this particular crime. As a result, defense counsel secured a low-end standard range sentence for his client. Without more, Mr. Carlos has failed to rebut the presumption that tactical reasons existed for defense counsel not to argue admittedly failed defenses as mitigating circumstances. Mr. Carlos's claims for ineffective assistance of counsel fail.

No. 32407-9-III
*State v. Carlos*

Affirm.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____   _____
Siddoway, C.J.                                  Korsmo, J.

29